UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 16-cr-10110-IT |
| | * | |
| WANER MANUEL LARA and | * | |
| EDWIN SOTO, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

July 31, 2017

TALWANI, D.J.

I.     Introduction

A federal grand jury indicted Defendant Waner Manuel Lara for possession with intent to

distribute a controlled substance (heroin and fentanyl), in violation of 21 U.S.C. § 841(a)(1), and

indicted both Lara and Defendant Edwin Soto for conspiracy to possess with intent to distribute

and to distribute a controlled substance (heroin and fentanyl), in violation of 21 U.S.C. § 846.

Soto and Lara seek to suppress items seized during searches of motor vehicles in which they

traveled on December 29, 2015, and March 19, 2016, respectively. After a two-day evidentiary

hearing, Lara's Motion to Suppress Physical Evidence – (Warrantless) [#70] and Soto's Motion

to Suppress Physical Evidence [#95] are DENIED.

II.     Factual Record

A.     Investigation of Soto

Newton Police Officer and Task Force Officer David Spirito ("Spirito") testified about an

undercover investigation into Soto's activities in early- to mid-2015. As part of that

investigation, officers set up a controlled buy where Soto would purchase 5,000 oxycodone pills.

On June 16, 2015, Soto was arrested after arriving at the designated location with $50,000 in

United States currency. After Soto's arrest, Spirito interviewed Soto about his knowledge of drug trafficking activities in the area. During the interview, Soto told Spirito about his knowledge of other drug traffickers who distributed cocaine and oxycodone, and stated that he had previously been arrested on a federal charge for drug distribution involving cocaine and oxycodone. Additionally, at some point during the investigation, Spirito learned that Soto lived at 34 Bristow Street in Saugus, Massachusetts, with his wife, Candy Cuevas.

B.    *Investigation of Ramon Baez*

Haverhill Police Officer and Task Force Officer Matthew Woodman ("Woodman") testified that in late 2015 and early 2016, Drug Enforcement Administration agents conducted an investigation into Ramon Baez's possible drug trafficking activities. Woodman was the case agent overseeing this investigation. On September 10, 2015, agents began intercepting wire and electronic communications over a telephone line that belonged to Baez. Evidentiary Hr'g Ex. ("Hr'g Ex.") 2 ¶ 8 [#134-1].

Between December 20, 2015, and December 24, 2015, agents intercepted multiple communications between Baez and an unidentified male, who agents later identified as Soto. See Hr'g Exs. 1A-1C [#134]. For example, on December 20, 2015, Soto told Baez that "I think we'll square up tomorrow," and that he would let Baez "know if [Baez] can bring one down at that time." Hr'g Ex. 1A [#134]. Further, on December 24, 2015, Soto stated "I still having [sic] that one that I unwrapped . . . if I had ran out of that one I would grab another one from you and get in the commitment . . . come down and pick up the tickets." Hr'g Ex. 1C [#134]. In a sworn affidavit submitted to this court in support of an application for a criminal complaint, Woodman explained his interpretation of these calls, based on his training and experience and his familiarity with the ongoing investigation. See Hr'g Ex. 2 [#134-1]. For example, he interpreted the December 20, 2015, call as a discussion between Soto and Baez regarding Soto's payment

for a prior drug transaction and scheduling for a future drug transaction. Id. ¶ 13. Similarly, he

interpreted the December 24, 2015, call as a discussion between Soto and Baez about Soto's

possession of one kilogram of drugs received from Baez, as well as drug proceeds to give to

Baez. Id. ¶¶ 16-17.

Agents also intercepted multiple communications between Soto and Baez on December

28, 2015. For example, during an intercepted communication at approximately 4:30 p.m., Baez

asked Soto if Soto thought he could "help [Baez] with something," and Soto replied that he could

"help [Baez] with part of it." Hr'g Ex. 1D [#134]. Woodman testified that based on his

surveillance and his review of these communications, see Hr'g Ex. 1D-1I [#134], he believed

that on December 28, 2015, Soto and Baez arranged for Soto to give Baez money for a previous

drug transaction.

That evening, approximately six officers set up surveillance at the location Soto and Baez

had discussed, and maintained contact with the wire room to receive translated contents of

intercepted communications. In one such intercepted communication at approximately 9:30 p.m.,

Soto told Baez "she's been waiting for you a while" in "the white SUV. . . a white BM (BMW),"

and Baez replied "I'm at a black infinity with New Hampshire plates." Id. At around the same

time, agents observed a female driving a white BMW SUV, as well as a black Infiniti with New

Hampshire plates. See also Soto Mot. Suppress Ex. 1, at 5-6 ¶¶ 2-3, 5 [#95-1]. Agents were able

to confirm that the vehicles were at the meeting location together, and that the registered owner

of the white BMW SUV was Soto's wife, Candy Cuevas. See id. (stating that agents observed

Baez exit his vehicle, go to the passenger side of Cuevas' vehicle for "a brief moment," and then

return to his own vehicle). After observing the white BMW SUV and the black Infiniti together

at the meeting location, Woodman drove to 34 Bristow Street in Saugus, Massachusetts, where

the white BMW SUV was registered. Id. When he arrived at 34 Bristow Street, he saw the white BMW SUV that was previously seen on surveillance. See id. at 6 ¶ 6.

On December 29, 2015, agents intercepted multiple communications between Soto and Baez. See Hr'g Ex. 1J-1O [#134]. At 3:32 p.m., agents intercepted a call during which Soto told Baez, "I already got rid of one of them, but I still have the other one there . . . What's bugging us right now is the number is not too comfortable . . . I could give that one back and square up for the other one. If you want to, give me a chance until later on to see what could happen." Hr'g Ex. 1K [#134]. Baez replied, "No, I'm going to play stupid with this one. Call me like at 7:00 or 8:00 to see." Hr'g Ex. 1M [#134]. On another intercepted call at 8:46 p.m., Baez told Soto "I'm too tired. I won't go. Leave it there with the other nephew. I will call you when you go there." Id. Soto replied, "I'm tired, too. I don't want to go out. But I will go out very quickly to bring you that." Id. Woodman stated in his sworn affidavit that based on his training and experience and familiarity with the investigation, he interpreted these calls as discussions between Soto and Baez regarding Soto's possession of one kilogram of drugs received from Baez, and their plans for Soto to return that kilogram to Baez. Hr'g Ex. 2 ¶¶ 20, 22 [#134-1].

Meanwhile, agents had established surveillance at Soto's residence "in anticipation of a transaction of narcotics and U.S. currency which was to occur between Soto and Baez that evening." Soto Mot. Suppress Ex. 1, at 1 ¶ 2 [#95-1]. At approximately 9:23 p.m., agents observed Cuevas' white BMW departing from Soto's residence, and agents surveilled the vehicle as it travelled from Saugus to Lynn. Id. at 1 ¶¶ 3-4. On another intercepted call at 9:28 p.m., Soto stated, "Buddy, call him to be there in 2 minutes please, to call me right away." Hr'g Ex. 1N [#134].

Massachusetts State Police Trooper Bradford Porter ("Porter") testified that at approximately 9:30 p.m., he received a request from Woodman to conduct a motor vehicle stop of Cuevas' vehicle. Porter had not previously been involved with the investigation into Baez's drug trafficking activities, but had worked with Woodman on other cases. Woodman and Porter testified that Woodman called Porter requesting a "wall-off" stop, which Porter explained is a motor vehicle stop conducted at the behest of another agency. Porter further testified that Woodman explained to him that Woodman was conducting a narcotics investigation that included court-authorized intercepts, and that Woodman had reason to believe that Cuevas' vehicle contained either drugs or currency. Woodman did not provide any additional details regarding the investigation or the contents of the intercepted communications.

Porter subsequently effected the stop. Soto Mot. Suppress Ex. 1, at 1 ¶ 5 [#95-1]. He testified that he stopped the car after observing the vehicle cross over the double-yellow lines twice. See also id. On an intercepted call at 9:36 p.m., Soto told Baez "Damn! I'm at the corner away from them, and the police pulled me over." Hr'g Ex. 1O [#134].

Porter testified that after another police officer arrived, he asked Cuevas and Soto to exit the vehicle and deployed his narcotics detection canine, "Luca," to sniff the vehicle. According to testimony from Porter, he had worked with Luca for approximately one and a half years prior to the motor vehicle stop, and Luca had been trained as a narcotics detection canine, to detect cocaine, heroin, and methamphetamine. Her training included successful completion of approximately eight weeks of training to obtain an initial certification in narcotics detection, as well as a yearly recertification. Porter and Luca began patrolling as a narcotics-certified team in June 2015; during that time, Luca was utilized for narcotics detection approximately 15-20 times, and gave a positive alert for narcotics less than 5 times.

Porter testified that Luca alerted to the presence of narcotics at the exterior rear hatch and the front passenger seat of the vehicle, and that after Luca's alert, he searched the vehicle. Porter did not find any drugs, but did find $99,200 in cash, packaged in two separate bags—one on the floor of the front passenger seat, and one on the floor of the rear passenger seat. Woodman stated in his sworn affidavit that "[b]ased on intercepted calls . . . [he] believe[d] that the $100,000 was partial payment for two kilograms of heroin Soto previously had obtained from Baez." Hr'g Ex. 2 ¶ 24 [#134-1]. Porter testified that Soto and Cuevas, who were not arrested at that time, were allowed to leave the scene. The vehicle was seized by the Massachusetts State Police and transported to the Massachusetts State Police barracks to be searched for narcotics. Soto Mot. Suppress Ex. 1, at 2 ¶ 8 [#95-1]. No narcotics were found in the vehicle. Id. Soto was arrested on April 12, 2016. Soto Mot. Suppress Ex. 2, at 2 ¶ 9 [#95-2].

C.    *Surveillance and Arrest of Lara*

The investigation into Baez's drug trafficking activities continued in early 2016. Agents intercepted communications on at least January 29, 2016, February 1, 2016, and March 17-19, 2016, between Baez and an unidentified male, later determined to be Lara. For example, in an intercepted communication between Baez and Lara on January 29, 2016, Lara stated "I wanted 100 plantains, and add about forty pesos of cut to those plantains so they come out at five per peso." Gov't Resp. Lara Mot. Suppress Ex. D ¶ 56 [#85]. Baez then asked, and Lara confirmed, that the order was "for today," "for right now." Id. Woodman, in his sworn affidavit submitted to this court, stated that based on his training and experience and his familiarity with the investigation, he interpreted this call to mean that Lara ordered 100 grams of heroin and 40 grams of "cut" from Baez, and that the two men discussed the timing of the transaction, among other things. Id. ¶ 57.

In another intercepted communication on February 1, 2016, Lara asked Baez "don't you have the camera you gave me?" later clarifying "[t]he camera you gave me at first. You don't have that one?" Id. ¶ 58. Baez stated "[n]ot that one. That one was changed. But it works the same." Id. In response, Lara stated "[i]t doesn't work the same . . . the other cameras are not selling the same." Id. Baez then asked "what do you need?" to which Lara replied "[i]f you have the same work, at least about fifty and up, or so." Baez then suggested "[l]et's get you at least 100 pesos or so," to which Lara replied "[b]ut it has to be the same camera. . . . If you get product, get it so I can take a couple of samples with it." Id. Lara later stated that "[i]f it can be done today, then I can head up there today," to which Baez replied "[t]hat's fine. About the other camera. Do you have it there . . . ?" Id. Lara answered "[t]he biggest camera is ready. I have to pick it up. The little camera is around. The fifty is around." Id. In his sworn affidavit, Woodman stated that based on his training and experience and his familiarity with the investigation, he interpreted this call as a discussion between Lara and Baez regarding the quality of heroin Baez distributed to Lara, Lara's dissatisfaction with the quality of the most recent heroin and Baez's plan to retrieve that heroin, and a potential further drug transaction. Id. ¶ 59.

Lara also placed or received calls to and from Baez on March 17, 18, and 19, 2016, regarding the purchase of heroin. For example, during an intercepted communication on March 17, 2016, Lara requested that Baez bring him "50 plantains so I can resolve something," to which Baez replied "okay." Hr'g Ex. 3, at 1 [#134-2]. Lara further stated "I took some photos and set it up there with a 9 ½ exit and passed good." Id. On another intercepted communication later that day, Lara stated that he wanted Baez to "bring some more . . . 200. I won't be calling you every day going back and forth. Let's do this right now. 200." Id. at 3. Also later that day, Baez and Lara exchanged several calls between 5:34 p.m. and 5:37 p.m. At 5:34 p.m., Baez stated "[o]pen

up," to which Lara replied "[g]ive me a second." Id. at 4. Shortly thereafter, Lara stated "[g]ive me a second I'm arriving. I'm at the same street." Id. at 5. At 5:37 p.m., Lara stated "I'm seeing you now," to which Baez replied "You saw me? I don't see you." Id. at 6. At approximately 5:52 p.m. the same day, Lara called Baez stating "[t]hat's not the same stuff you used to give me." Id. at 7. Baez responded "Is different yes," and Lara then stated "Well they want it but the same . . . is not the same stuff." Id. Baez stated "What's important is that is good. Don't you think?" Id. Lara replied "Yes if it's good then is good. . . I just don't want them to come back all pissed off with me." Id. Woodman testified that based on his training and experience and knowledge of this investigation, he believed that on these calls, Lara requested 50 grams of heroin and took samples of the narcotics for quality testing. He further testified that he believed Baez confirmed that Baez would bring Lara 50 grams of heroin.

Lara and Baez also spoke several times on March 18, 2016. For example, Lara called Baez stating "I have two news, a good one and a bad one." Hr'g Ex. 3, at 11 [#134-2]. When Baez asked "give me the good one (news)," Lara stated "I have some tickets for you to collect/pick them up, and the bad one is, what I told you yesterday. . . . They don't want that, dude." Id. Baez later asks "How can we do it? [C]an you come by quickly?" Id. Lara later states "Go ahead, I'll be there so you can pick it up." Id. at 12. Later that day, Baez called Lara stating "I'm already here," to which Lara replied "Okay." Id. at 13. Woodman testified that based on his training and experience and knowledge of the investigation, he was able to summarize these communications as follows: Baez was providing heroin to Lara, and at some point, the drugs provided to Lara did not pass quality testing. Further, Lara and Baez were making arrangements for Lara to return the product to Baez.

Finally, on March 19, 2016, during another intercepted call between Baez and Lara at approximately 12:19 p.m., Baez stated "These 'women arrived' and I'm running an errand you know . . . once I'm done running . . . I will be calling you so I can take these women to you." Hr'g Ex. 3, at 14 [#134-2]. When Baez asked "But they are the same right?" Lara replied "No, they are not the same buddy . . . ." Id. Baez stated that the two would "talk later when I stop by," to which Lara responded "Go ahead." Id. Woodman testified that based on his training and experience and knowledge of the investigation, he interpreted these calls to mean that on March 19, 2016, Baez had heroin to give to Lara, and that they would talk later to arrange to pick up the drugs.

At approximately 1:30 p.m. on March 19, 2016, officers established surveillance at Baez's residence. Gov't Resp. Lara Mot. Suppress Ex. B [#85]. On an intercepted communication at 2:48 p.m., Baez told Lara to "[h]urry and come over so we can talk now that I don't have anyone here; you know what I mean." Hr'g Ex. 3, at 16 [#134-2]. Lara stated that he would call Baez back after dropping off his daughter. Id. On an intercepted communication at 3:02 p.m., Lara called Baez to announce his arrival at Baez's residence. Id. at 17. Woodman testified that at approximately the same time, he observed Lara arriving at Baez's residence in a Grey Toyota Avalon (the "Avalon"). See also Gov't Resp. Lara Mot. Suppress Ex. C ¶ 26 [#85]. At that time, agents decided to request a wall-off stop. Massachusetts State Police Trooper Scott Quigley ("Quigley") testified that also at approximately 3:00 p.m., Massachusetts State Police Trooper Gondella ("Gondella") called him, instructed him to drive to Lawrence, and gave him information regarding the Avalon, including that the Avalon "may be involved in narcotics transactions" and that officers wanted to try and stop the vehicle. See also Gov't Resp. Lara Mot.

Suppress Ex. A, at 1 [#85]. Quigley testified that after his telephone call with Gondella, he began traveling to Lawrence.

Woodman testified that he did not see Lara carrying anything as Lara entered Baez's residence, that Lara remained inside for approximately 15 minutes, and that upon exiting the residence, Lara did not appear to be carrying anything. Quigley testified that Woodman contacted him regarding the location of the Avalon once Lara left Baez's residence in the Avalon, and that Quigley then traveled to that location.

A short time later, Quigley stopped the Avalon. He testified that he stopped the vehicle after observing the driver commit two motor vehicle infractions: (1) the two driver's side tires of the Avalon crossed the double-yellow lines, and (2) the driver of the vehicle was manipulating the screen of a cell phone. Quigley further testified that when asked for his driver's license and registration, Lara handed Quigley the vehicle's registration and, because Lara did not have a driver's license, a Dominican Republic identification card. See also Gov't Resp. Lara Mot. Suppress Ex. A, at 1 [#85]. Shortly thereafter, Quigley determined that Lara did not have a valid driver's license, asked Lara to step out of the vehicle, and placed him under arrest for unlicensed operation of a motor vehicle. Id.

After arresting Lara, Quigley placed Lara in the rear seat of his cruiser, and called for another trooper to transport Lara for booking and for a tow truck to take away the Avalon. Id. at 1-2. While waiting for the trooper and the tow truck to arrive, Quigley began an inventory search of the Avalon. Id. Quigley testified that he conducted his search pursuant to Massachusetts State Police policy. He further testified that prior to the events here, he had, whilst searching other motor vehicles, encountered four or five hidden compartments, and that during the search of the

Avalon, he observed several indicators of a possible hidden electronic compartment, such as scratches and after-market wiring underneath the dashboard and plastic center console.

Eventually, Massachusetts State Police Trooper Strong arrived to transport Lara to State Police barracks, and the tow truck arrived to take away the Avalon. Id. at 2. Quigley followed the tow truck to the towing company's garage. Id. Officers (including Quigley and Woodman) then completed the inventory search of the Avalon. During that search, officers opened the hidden compartment and recovered 150 grams of a substance that field tested positive for heroin and fentanyl. Gov't Resp. Lara Mot. Suppress Ex. C ¶ 28 [#85].

III.    Discussion

Both Soto and Lara seek to suppress evidence—$99,200 and 150 grams of drugs, respectively—seized during searches of the motor vehicles in which they were traveling. Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). At the time of the searches, the government sought to justify the searches based on an observed traffic violations (as permitted under Whren v. United States, 517 U.S. 806, 810, 813 (1996)), an inventory search after a lawful arrest (as permitted under Cady v. Dombrowski, 413 U.S. 433, 441 (1973)), and the canine sniff (as permitted under United States v. Brown, 500 F.3d 48, 57 (1st Cir. 2007)). Soto and Lara argue that the traffic violations for which they were stopped did not occur, that Lara should not have been arrested for the unlicensed operation of a motor vehicle, and that the canine sniff in Soto's case was not reliable. In their view, these reasons for the searches are impermissible pretext. If the government relied solely on these grounds for the searches, the court would need to resolve various underlying factual disputes.

11

The government also justifies the searches, however, on probable cause based on the investigations. When a vehicle is on a public road, "police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014); see also Florida v. White, 526 U.S. 559, 563-64 (1999) ("[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband."). Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or "by a preponderance of the evidence." United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983) (internal citations omitted). "The standard of probable cause is the probability, not a prima facie showing, of criminal activity." United States v. Ciampa, 793 F.2d 19, 22 (1st Cir. 1986). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982).

To determine whether an officer had probable cause, courts may use the "fellow-officer" rule, also known as the pooled knowledge or collective knowledge doctrine, which "is a mechanism that in some circumstances allows a court to 'impute' facts known by one police officer to another police officer engaged in a joint mission." Morelli v. Webster, 552 F.3d 12, 17 (1st Cir. 2009) (citing United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997)). Under the

fellow-officer rule, "for example, when an officer who has probable cause 'directs an officer who lacks that knowledge to make the arrest, we "impute" to the arresting officer the directing officer's knowledge.'" Id. at 18 (quoting Meade, 110 F.3d at 193; citing United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002); Burns v. Loranger, 907 F.2d 233, 236 n.7 (1st Cir. 1990)). Courts applying the fellow-officer rule focus on "the collective knowledge possessed by, and the aggregate information available to, all the officers involved in [an] investigation." United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (quotation marks and citation omitted).

Using this framework, the court addresses whether the officers had probable cause for each of the searches.

### 1. December 29, 2015, Search

On December 29, 2015, Soto and Cuevas were stopped by Porter, who by his own admission had no prior involvement with the investigation into Baez's drug trafficking activities. The government asserts that Porter nonetheless had probable cause to stop Soto and search the vehicle for contraband by virtue of the fellow officer rule. Thus, the court must consider whether Woodman, who requested that Porter carry out the wall-off stop, had probable cause to stop Soto and search the vehicle for contraband.

By December 29, 2015, Woodman was aware of several facts connecting Soto to potential drug trafficking activity. First, Woodman knew from Spirito that Soto was, by Soto's own admission, a convicted drug dealer who had been arrested in June 2015 for drug trafficking. Second, Woodman listened to, or received summaries of, multiple intercepted communications between Soto and Baez in December 2015. This court credits Woodman's testimony that his training and experience, as well as his familiarity with the investigation, allowed him to form a reasonable interpretation of these exchanges as pertaining to drug transactions. Thus, for example, phrases such as "I still have that one that I unwrapped . . . I would grab another one

13

from you," and "I could give that one back and square up for the other one," indicate an exchange of money for drugs. Additionally, Woodman knew that on December 28, 2015, agents intercepted multiple communications between Baez and Soto setting up a meeting later in the day, and that same evening observed Cuevas' vehicle driving in the same location as Baez's parked vehicle, and Baez exit his vehicle and go briefly to the passenger side of Cuevas' vehicle. Finally, Woodman listened to, or received summaries of, multiple intercepted communications between Soto and Baez on December 29, 2015, regarding another potential drug transaction. For example, Soto told Baez that he "could give that one back and square up for the other one. If you want to, give me a chance until later on to see what could happen." Baez later told Soto "I'm too tired. I won't go. Leave it there with the other nephew. I will call you when you go there," and Soto replied, "I'm tired, too. I don't want to go out. But I will go out very quickly to bring you that." Woodman also received information from other agents that they had observed Soto traveling towards Baez's residence at the time of those calls. A common-sense view of these facts would "warrant a man of reasonable caution in the belief" that Soto was carrying either drugs, or the proceeds of a drug transaction, at the time of the motor vehicle stop.

Furthermore, although Porter testified that he had not previously been involved in the investigation into Baez's drug trafficking activities, Woodman not only requested that he conduct a wall-off stop, but also explained to Porter the reason behind it. For example, Porter testified that Woodman told him about a narcotics investigation that included court-authorized intercepts, and that Woodman had reason to believe that Cuevas' vehicle contained either drugs or currency related to that investigation. This information exchange is sufficient for the court to impute Woodman's probable cause to Porter. See Morelli, 552 F.3d at 18. Thus, when Porter stopped Soto, he had probable cause to believe the car contained drugs or the proceeds of a drug

transaction, and the subsequent search was within the bounds of the Fourth Amendment. Accordingly, Soto's <u>Motion to Suppress Physical Evidence</u> [#95] is DENIED.

   2. March 19, 2016 Search

  Similarly, the officer who stopped Lara on March 19, 2016, had no prior involvement with the investigation into Baez's drug trafficking activities. Here too, the government asserts that Quigley had probable cause to stop Lara based on the collective knowledge of the officers directing Quigley's activities. Thus, this court's determination turns on whether the officers directing Quigley had sufficient probable cause to stop and search the vehicle.

  Woodman testified that on March 19, 2016, agents had pre-arranged with the Massachusetts State Police to effect the wall-off stop, and that this decision was based on the intercepted communications they overheard between Baez and an unidentified male, later identified as Lara. As before, the court credits Woodman's testimony that based on his training and experience, as well as his familiarity with the investigation, these communications related to drug purchases. Thus, when Lara asked on March 17, 2016, for "50 plantains," and later asked Baez to "bring some more . . . 200," these requests can be interpreted as a request for drugs. Similarly, on March 18, 2016, Lara told Baez that he had "some 'tickets' for [Baez] to collect/pick them up," meaning drug proceeds. Finally, on March 19, 2016, Baez's statement that he could take "these women" to Lara indicates that Baez had drugs to deliver. Several hours later, Lara asked Baez to "open up," at the same time agents observed Lara arriving at Baez's residence. These communications, when viewed in context, would "warrant a man of reasonable caution in the belief" that, at the time agents ordered the wall-off stop, Lara would either have drugs or the proceeds of a drug transaction after leaving Baez's residence.

  Additionally, although Quigley had no prior knowledge of this information, he was told not only to drive to Lawrence and to look for a grey Avalon, but also that the Avalon "may be

involved in narcotics transactions." This information exchange is sufficient for the court to impute the probable cause possessed by Woodman to Porter. See Morelli, 552 F.3d at 18. Thus, when Quigley stopped Lara, he had probable cause to believe the car contained drugs or the proceeds of a drug transaction, and the search was proper. Accordingly, Lara's Motion to Suppress Physical Evidence – (Warrantless) [#70] is DENIED.

IV.     Conclusion

For the foregoing reasons, Lara's Motion to Suppress Physical Evidence – (Warrantless) [#70] and Soto's Motion to Suppress Physical Evidence [#95] are DENIED.

IT IS SO ORDERED.


Date: July 31, 2017                                              /s/ Indira Talwani
                                                                United States District Judge